UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Billie Munson, individually and as a representative of a class of participants and beneficiaries on behalf of the Macy's, Inc. Enhanced Benefits Program,<br><br>Plaintiff,<br><br>vs.<br><br>Macy's, Inc.; Aon Consulting, Inc.; Hewitt Insurance Brokerage LLC; and Aon Insurance Agency LLC,<br><br>Defendants. | No. 1:26-cv-08752<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiff Billie Munson, by her undersigned attorneys, on behalf of the Macy's, Inc. Enhanced Benefits Program, and similarly situated participants in the Plan and their beneficiaries, alleges upon personal knowledge, the investigation of her counsel, and upon information and belief as to all other matters, as to which allegations she believes substantial evidentiary support will exist after a reasonable opportunity for further investigation and discovery, as follows:

## NATURE OF THE ACTION

1. Employers offer various forms of compensation and benefits packages in order to attract and retain employees. Voluntary benefits insurance is one category of such compensation employees of certain employers are offered in exchange for their work.

2. Voluntary benefits insurance includes supplemental health insurance products—accident insurance, critical illness insurance, and hospital indemnity insurance—offered by employers, here Macy's, Inc. ("Macy's") via the Macy's, Inc.

Enhanced Benefits Program (the "Plan"). The employer, working with its insurance broker, here a series of affiliated Aon entities (collectively, "Aon"), selects the supplemental health insurance carrier and agrees to the terms of coverage, including the premiums. From the 2019 plan year through the 2021 plan year, the carrier was American Heritage Life Insurance Company, an Allstate subsidiary; beginning with the 2022 plan year, the carrier became Continental American Insurance Company, an Aflac subsidiary. Participants in the Plan fund the supplemental health insurance from their own wages.

3. Supplemental health insurance is one of the most commoditized products in the insurance industry. The underlying coverage structures—accident benefit triggers, critical illness conditions covered, hospital indemnity daily payment amounts—are substantially similar across carriers, as detailed below. Because the products are largely interchangeable, the main differences between one supplemental health insurance arrangement and another are not the quality and scope of coverage, but the amount of premiums paid by plan participants. And the difference in premiums is driven largely by commissions paid to the broker.

4. In the supplemental health insurance market, carriers do not set premium rates independently and then separately negotiate broker compensation. The process works in reverse: the broker, Aon here, specifies the commission structure it wants—whether a "heaped" commission (a high first-year payout followed by lower renewal rates) or a "level" commission (a consistent percentage paid every year)—and the carrier bundles that commission into the premium rate. The

carrier prices the product to achieve its target profitability after accounting for the broker's commission demand, its own administrative costs, and its profit margin. Thus, the participant's premium payments are a direct function of the broker's compensation demands. When the broker demands more, the carrier charges more, and participants pay more.

5. This arrangement produced extraordinary results for Aon but conferred no value on participants. In the 2019 plan year, commissions and fees on the Plan's supplemental health insurance lines of coverage consumed 50.8 percent of premiums—including a 65.1 percent commission rate on the critical illness contract, meaning that nearly two of every three dollars participants paid for critical illness coverage that year went to the broker rather than toward insurance. The rates then declined toward renewal levels, reaching 22.8 percent by the 2021 plan year. Then, in the 2022 plan year, Macy's and Aon switched carriers—from the Allstate subsidiary to the Aflac subsidiary—and the commission rate immediately spiked to 62.8 percent, nearly triple the prior year. This is the hallmark of a "heaped" commission arrangement, in which the broker extracts the maximum possible first-year payout from a new carrier placement, knowing the cost will be embedded in the rates participants pay for years to come, and the practice known as "churning"—switching carriers to capture a fresh first-year windfall. Over the six plan years from 2019 through 2024, Aon's commissions and fees averaged 36.7 percent of every premium dollar participants paid.

6. The loss ratio tells the story of what participants received in return. The loss ratio—the percentage of premiums returned to participants as claims—is the single most direct measure of value in insurance. Unlike the "combined ratio" used to measure carrier profitability (which includes carrier expenses and profit margins alongside claims), the loss ratio isolates the question that matters most to the people paying premiums: of every dollar I pay, how much comes back to me as a benefit? After deducting the 36.7 percent average broker compensation paid to Aon, the effective loss ratio available to participants was driven well below the regulatory floors that state and federal authorities have established for insurance products. For context, the Affordable Care Act mandates a minimum 85 percent medical loss ratio for large employer-sponsored health plans. State regulators impose minimum loss ratios of 50 to 60 percent for hospital indemnity insurance and 60 to 70 percent for specified disease policies. *See, e.g.*, N.Y. Comp. Codes R. & Regs. tit. 11, § 52.45. An arrangement that diverts more than one-third of every premium dollar to broker compensation before the carrier takes its own expenses and profit makes it arithmetically impossible to deliver loss ratios that meet even the most permissive of these regulatory benchmarks. Macy's participants paid far more for far less value for their premium dollars than any regulatory standard contemplates.

7. Plaintiff Billie Munson was an Operations Supervisor at Macy's West Virginia location. She began working at Macy's in 2012. She enrolled in Macy's supplemental health benefits as a safety net just in case something happened to her. Between 2019 and 2024, Macy's deducted from her paychecks for that coverage. What

Plaintiff Billie Munson did not know—what Macy's never told her—is that for every dollar taken from her paycheck, approximately thirty-seven cents went to broker commissions. She did not want to pay thirty-seven cents of every dollar for brokerage services. She wanted insurance at a reasonable price. She was injured because she paid for brokerage commissions that did not benefit her in any way. She could have purchased essentially the same level of insurance coverage at a much lower cost without exorbitant brokerage commissions. Macy's knew or should have known that the brokerage commissions were exorbitant and that equivalent insurance coverage was widely available at a much lower cost.

8. Plaintiff Billie Munson's experience was not unique. Across the 2019 through 2024 plan years, employees of Macy's and its affiliated brands paid approximately $36.1 million in premiums for supplemental health insurance—accident, critical illness, and hospital indemnity coverage—through the Plan. Approximately 36.7 percent of all premiums paid by employees went to broker commissions and fees—approximately $13.2 million over six plan years. These were not commissions paid on top of premiums. They were baked directly into the premium rates that Macy's employees paid from their wages. The carriers set their premium rates to account for the compensation that Aon demanded—directly in connection with the placement of the insurance at Macy's. A higher commission meant a higher premium. A lower commission meant a lower premium. Every dollar paid to Aon was a dollar taken from employee paychecks.

9. Defendant Macy's, as the Plan's fiduciary, had a duty under the Employee Retirement Income Security Act of 1974 ("ERISA") to select a prudent supplemental health insurance policy for its employees. This duty required Macy's to ensure that participants paid a reasonable premium for insurance services and that the insurance value was reasonable in light of the price paid. Macy's was also required to determine whether the brokerage compensation paid was reasonable for the services provided. The premiums paid by participants were objectively unreasonable; the insurance coverage provided to participants was objectively unreasonable; and the commissions and fees paid to the broker were objectively unreasonable.

10. Macy's projected the Plan as an employee benefit but knew or should have known that Aon's commissions meant that the Employees were paying rates above what they could have achieved in the private market.

11. Worse, Macy's many corporate ties to Aon divided, or had the potential to divide, their loyalty to their employees. Macy's has hired Aon for a variety of corporate services as well as services for other employee benefit plans.

12. A prudent fiduciary would not have chosen the supplemental health insurance Macy's offered to its employees at the premium levels paid by participants. A prudent fiduciary would have questioned and rejected the commission structure. A prudent fiduciary would have probed whether the broker's compensation was reasonable for the services it provided. A prudent fiduciary would have examined readily available market benchmarks showing that many substantially similar plans

pay broker compensation of 10 percent or less for identical products. Indeed, Aon itself placed the identical products, through the identical carrier, at one of Macy's most direct retail competitors for essentially no commission at all. Macy's did not do those things.

13. Macy's own enrollment materials—issued to its hourly, seasonal, and part-time workforce—describe these supplemental health insurance products as offered "at discounted group rates" when in fact, the rates were inflated by broker compensation running multiples of what comparable plans pay for identical products.

14. Plaintiff brings this action under ERISA §§ 502(a)(2) and 502(a)(3), 29 U.S.C. §§ 1132(a)(2) and 1132(a)(3), on behalf of the Plan and a class of Plan participants and beneficiaries. Plaintiff alleges that Macy's breached its fiduciary duties of prudence and loyalty under ERISA § 404(a), 29 U.S.C. § 1104(a), by selecting and maintaining a supplemental health insurance program that caused the Plan and participants to pay unreasonably high premiums for the level of coverage provided, by causing the Plan and participants to pay grossly unreasonable broker compensation, and by misrepresenting the nature of the rates to participants. Macy's must restore all losses suffered by the Plan and pay Plaintiff equitable restitution.

15. Plaintiff further alleges that the supplemental insurance and commission arrangements constituted a series of prohibited transactions under ERISA § 406(a), 29 U.S.C. § 1106(a), because the Aon entities and the carriers were parties in interest who furnished services to the Plan and Aon received objectively excessive compensation, directly or indirectly, in connection therewith.

16. Plaintiff further alleges that the Aon entities knowingly participated in Macy's breaches of fiduciary duty and in the prohibited transactions, and seeks disgorgement of all excessive compensation received by Aon pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

17. Plaintiff also seeks prospective equitable relief requiring Macy's to conduct a competitive, conflict-free process for the Plan's supplemental health insurance program and to correct the ongoing misrepresentations in its participant-facing enrollment materials.

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1), which provides for exclusive federal jurisdiction over actions brought under ERISA § 502(a).

19. This Court has personal jurisdiction over Defendant Macy's because Macy's maintains its principal executive offices in New York, New York, within this District, and transacts substantial business in this District.

20. This Court has personal jurisdiction over the Aon Defendants because they transacted business within this District in connection with the Plan, provided services to the Plan within this District, and received commissions and fees, directly or indirectly, from Plan assets.

21. Venue is proper in this District under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the fiduciary breaches took place in this District and at least one Defendant resides or may be found in this District.

22. Venue is also proper under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this action occurred in this District.

## PARTIES

### A. Plaintiff Billie Munson

23. Plaintiff Billie Munson is a resident of the State of West Virginia. Plaintiff was employed by Macy's in West Virginia as an Operations Supervisor from 2012 to 2025. Plaintiff enrolled in the Plan's supplemental health insurance coverage from 2019 through 2024. Plaintiff enrolled because Macy's benefits materials—presented under the Macy's name and integrated into the same enrollment portal as medical and dental coverage—presented these products as part of Macy's official benefits package, offered "at discounted group rates." Plaintiff trusted that her employer, as a fiduciary, had ensured that the premiums deducted from her paycheck reflected the reasonable cost of insurance—not a vehicle for enriching brokers. A substantial portion of Plaintiff's premiums was paid to Aon as commissions embedded in the premium rates. Plaintiff suffered injury for the reasons explained above.

### B. Defendant Macy's, Inc.

24. Defendant Macy's, Inc. is a national omnichannel retailer with its principal executive offices at 151 West 34th Street, New York, New York. Macy's operates retail stores and digital businesses under the Macy's, Bloomingdale's, and

Bluemercury brands, and employs tens of thousands of individuals across the United States. Macy's Employer Identification Number ("EIN") is 13-3324058.

25. Macy's is the sponsor of the Macy's, Inc. Enhanced Benefits Program (Plan No. 983) (the "Plan"), within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B), and the administrator of the Plan within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A). The Plan became effective on July 1, 2016, and operates on a plan year beginning July 1. The Plan's most recent Form 5500 filing reported over 50,000 participants.

26. Macy's is a named fiduciary of the Plan within the meaning of ERISA § 402(a), 29 U.S.C. § 1102(a), because it is the Plan administrator. Macy's is also a functional fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercised discretionary authority and control over the management and administration of the Plan, including by selecting and retaining Aon as the Plan's broker for voluntary benefits, selecting and switching the supplemental health insurance carriers, establishing the supplemental health insurance program, integrating it into Macy's employee benefits infrastructure, promoting it during annual open enrollment, facilitating payroll deduction of premiums, and providing employee data to Aon and the carriers to enable enrollment.

27. As an ERISA fiduciary, Macy's was required to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). Macy's

was further required to act "solely in the interest of the participants and beneficiaries" of the Plan and "for the exclusive purpose of providing benefits to participants and their beneficiaries" and "defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A).

28. ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), imposes an objective standard measured against the conduct of a hypothetical prudent expert, not a lay person. *See, e.g.*, *Usenko v. MEMC LLC*, 926 F.3d 468, 473 (8th Cir. 2019).

29. The duty of prudence encompasses both process and outcome. A fiduciary must employ a prudent process for evaluating products, fees, and service-provider compensation.

30. The duty of prudence is ongoing. A plan fiduciary must review all service-provider arrangements and Plan contracts at regular intervals to ensure they remain prudent and that service-provider compensation is reasonable.

31. A prudent process for evaluating broker compensation includes, at minimum: (a) benchmarking broker compensation against market rates for comparable services; (b) periodic competitive bidding or solicitation of alternative proposals; (c) evaluation of the scope and quality of services provided relative to fees charged; (d) monitoring whether fees remain reasonable as plan assets and participant populations change; and (e) careful consideration of any independent evidence that fees may be excessive.

C. The Aon Defendants

32. Defendant Aon Consulting, Inc., Defendant Hewitt Insurance Brokerage LLC, and Defendant Aon Insurance Agency LLC (collectively, “Aon” or the “Aon Defendants”) are, upon information and belief, affiliated subsidiaries of Aon plc, one of the largest insurance brokerage and consulting firms in the world. Aon, through these affiliated entities, has served continuously as the Plan's broker for voluntary benefits insurance from at least the 2019 plan year to the present. Macy's selected Aon to serve as broker.

33. The Plan's Form 5500 Schedule A filings identify the Aon entities' roles. For the 2019 through 2021 plan years, Hewitt Insurance Brokerage LLC was reported as a broker on every supplemental health insurance contract and received approximately $6.4 million in commissions, and Aon Consulting, Inc. was reported alongside it and received approximately $176,000 in fees. For the 2022 through 2024 plan years, Aon Insurance Agency LLC was reported as the sole broker on the Plan's supplemental health insurance contract and received approximately $6.7 million in commissions. In total, across the 2019 through 2024 plan years, the Aon Defendants received approximately $13.2 million in commissions and fees from Plan assets in connection with the Plan's supplemental health insurance contracts.

34. Each Aon Defendant is a party in interest to the Plan within the meaning of ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(B), because it provides services to and for the benefit of the Plan, namely advising on the selection and monitoring of supplemental health insurance and other products.

D. Non-Parties: American Heritage Life Insurance Company and Continental American Insurance Company

35. American Heritage Life Insurance Company ("American Heritage"), a subsidiary of The Allstate Corporation, is the insurance carrier that issued the Plan's voluntary benefits policies—separate accident, critical illness, and hospital indemnity contracts—for the 2019 through 2021 plan years. Continental American Insurance Company ("Continental American"), a subsidiary of Aflac Incorporated, is the insurance carrier that issued the Plan's voluntary benefits policy—a single bundled accident, critical illness, and hospital indemnity contract—for the 2022 plan year through the present. Each carrier is a party in interest to the Plan within the meaning of ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(B), because it provides services to the Plan. Each carrier received premiums from Plan participants through payroll deductions processed by Macy's, paid commissions to Aon from those premiums, and set its premium rates to incorporate the compensation demanded by Aon, such that participants' premiums directly reflected the cost of broker compensation.

E. Non-Party: The Macy's, Inc. Enhanced Benefits Program

36. The supplemental health insurance program is part of an ERISA plan. Each year, under penalty of perjury, Macy's files a Form 5500 for the Plan. Macy's says: the Plan is a single-employer plan (Part I.A); it is the Plan's sponsor (Part II.2a); each year an executive at Macy's signs the Form 5500 on behalf of the Company in its capacity as Plan administrator; and the supplemental health insurance program is part of the Plan, included in the Form 5500 under the same three-digit plan number

(983) as the Plan's other welfare benefit offerings. Across the 2019 through 2024 plan years, the supplemental health insurance contracts covered over 8,000 lives per year.

37. The supplemental health insurance program was selected by Macy's, the employer of the participants in the Plan. Aon, the broker, was selected by Macy's to advise it on behalf of the Plan in selecting the carrier. Macy's selected, or authorized Aon to select, American Heritage and later Continental American as the carriers. Macy's adopted the terms of the insurance arrangements. Macy's offers supplemental health insurance through its human resources function as part of a suite of benefits available to its employees.

38. Macy's integrated the supplemental health insurance products into its broader employee benefits platform, presenting them to employees alongside employer-sponsored medical, dental, and vision coverage in a unified benefits package through a unified enrollment portal. Employees enroll in these products during Macy's annual open-enrollment period through Macy's benefits portal. Employees' election forms are processed through Macy's human resources systems. Premium payments are deducted directly from employees' paychecks by Macy's payroll department and remitted to the carrier. This infrastructure—the benefits platform, the enrollment processes, the payroll systems, the employee communications—is controlled by Macy's.

39. Macy's promoted the supplemental health insurance products during its annual open-enrollment period through company-wide communications and enrollment materials distributed to employees. Macy's provided employee census

data, including personal identifying information, job classifications, and salary information, to Aon and the carriers to facilitate enrollment and underwriting. Macy's maintained the payroll systems and human resources information systems that constituted the administrative infrastructure of the program.

40. Macy's-issued benefits guides explicitly reference the supplemental health insurance products and present them to employees as part of Macy's official benefits offerings. Macy's "Benefits at a Glance" enrollment guides for the 2025-2026 plan year—issued separately to its Seasonal, Flex, Contingent, Temporary, Short Hour, and Evening/Weekend colleagues and to its Bluemercury hourly colleagues—state, in identical language: "To help defray costs, we offer Critical Illness, Accident, and Hospital Indemnity options at discounted group rates."

## DEFENDANTS CAUSED PARTICIPANTS TO PAY FAR MORE FOR SUPPLEMENTAL HEALTH INSURANCE THAN THEY SHOULD HAVE

### A. Participant-Paid Premiums Are Plan Assets

41. Participant premium contributions to supplemental health insurance are plan assets. Employee contributions to an ERISA-covered plan become plan assets as of the earliest date on which such contributions can reasonably be segregated from the employer's general assets. Here, Macy's deducted premiums from employees' paychecks and remitted them to the carrier—a process that identifies and segregates employee contributions at the moment of deduction. Commission payments from those premiums to brokers are direct or indirect transfers of plan assets because the amount of the premium payment is directly correlated to the

compensation commanded by Aon. The commissions are payments funded by participant premiums—money deducted from employees' paychecks—that flow through the carrier and are distributed to brokers. The carrier is a conduit, not the source. The source is the participant's paycheck.

B. Loss Ratios Show Participants Overpaid for Coverage

42. The loss ratio is the most important metric for evaluating whether participants overpaid for insurance coverage because it goes directly to value received for price paid. The loss ratio measures the percentage of premiums that the insurance carrier pays out in claims to participants. It directly answers the question that matters most to participants: how much coverage am I getting for every dollar in premiums?

43. The loss ratio is superior to other insurance metrics for this purpose. The "combined ratio"—which includes the carrier's operating expenses and profit margin alongside claims—measures the carrier's profitability, not whether the insured overpaid. A carrier can have a combined ratio of 95 percent (barely profitable) while paying out only 30 percent of premiums in claims. The difference is consumed by commissions, administrative costs, and overhead. The loss ratio strips away the carrier's expenses and isolates the relationship between what participants pay and the value of the product.

44. For supplemental health insurance products, the loss ratio has an additional virtue: it reflects the impact of excessive broker compensation. Every dollar diverted to commissions is a dollar that cannot be returned to participants as

benefits. A plan with a 36.7 percent average broker compensation load starts with a maximum possible loss ratio of 63.3 percent—before the carrier even takes its administrative expenses, taxes, and profit. In the Plan's 2022 plan year, when broker compensation consumed 62.8 percent of premiums, the maximum possible loss ratio was 37.2 percent. State regulators have recognized the importance of loss ratios by imposing minimum floors: New York, for example, requires minimum loss ratios of 50 to 60 percent for hospital indemnity insurance and 60 to 70 percent for specified disease policies. N.Y. Comp. Codes R. & Regs. tit. 11, § 52.45. An arrangement that begins by diverting more than one-third—and in some years nearly two-thirds—of premiums to broker compensation makes compliance with even the lowest of these floors exceedingly difficult, and the shortfall represents value that participants lost because their premiums were being consumed by excessive broker compensation rather than returned as benefits.

45. Within the supplemental health insurance market generally, carriers report loss ratios of approximately 45 to 50 percent. That means that for every $100 in premiums paid, between $45 and $50 is paid out in claims, and the remaining $50 to $55 goes to the carrier. The carrier then pays the broker's compensation, with the balance going to carrier administrative expenses, taxes, and profit.

46. A broker commission of 10 percent means that $10 of this $100 would go to the broker, and the $40 to $45 balance remains with the carrier.

47. Because Aon's compensation averaged 36.7 percent of premiums, the loss ratio would drop from 45 to 50 percent to as low as 18.3 percent, assuming all

other expenses remain constant. Of every $100 in premiums, $36.70 would be paid to the broker. The carrier would continue to retain its $40 to $45 to cover expenses, taxes, and profit. The result is a far lower share being paid out in claims, shrinking to $18.30 to $23.30 ($100 in premiums, less $36.70 in broker compensation, less $40 to $45 in carrier payments). In the 2022 plan year, when Aon's compensation consumed 62.8 percent of premiums, the same arithmetic leaves nothing at all: $100 in premiums, less $62.80 in broker compensation, less $40 to $45 in carrier payments, is negative—an arrangement that is only sustainable if the carrier prices premiums far above the actuarial cost of the coverage.

48. The precise loss ratios for the Plan's supplemental health insurance products will be established following discovery and analysis of relevant claims data. In any event, the impact of Aon's outsized compensation harms employees: they can either pay the same amount in premiums but receive less in coverage, or pay a higher premium to cover the same claims.

49. This lower loss ratio was not the product of a high-risk, high-cost insurance program. It was the structural and inevitable consequence of an arrangement in which more than one-third of every premium dollar was diverted to broker compensation.

C. <u>Participants Paid Excessive Premiums Due to Exorbitant Commissions</u>

50. Insurance carriers do not set supplemental health insurance premium rates and then decide how to compensate brokers. Rather, the broker specifies the commission structure it requires as a condition of placing the business between an

employer and a carrier. The carrier then builds that commission into its premium charge. The premium charge is the sum of: (a) the "pure premium"—the actuarially determined cost of paying expected claims; (b) the carrier's administrative expenses; (c) the carrier's target profit margin; (d) premium taxes; and (e) the broker's compensation. Each component is additive. Higher broker compensation produces a higher premium rate, dollar for dollar. The inverse is also true—lower broker compensation means lower premiums.

51. The commission is not a markup applied to a separately disclosed base cost. The carrier establishes a single gross premium rate that embeds all cost components—claims, expenses, taxes, profit, and broker compensation. The broker's commission percentage is applied to that all-in gross rate, which means the commission is calculated on top of, and grows proportionally with, the carrier's own costs and profit margin. This is basic arithmetic. If a carrier determines that the pure premium for a particular accident insurance product is $10 per month, and its administrative expenses, taxes, and profit margin add another $4, then the base cost of the product is $14. When the broker demands a 36.7 percent commission, the carrier must set the premium at approximately $22.12 per month (because the commission is calculated as a percentage of the premium: $22.12 × 36.7% = $8.12, and $22.12 − $8.12 = $14, covering the carrier's base costs). If instead the broker takes compensation of 10 percent—as is the case at comparably situated employer plans that have negotiated market-rate arrangements—the carrier can offer the same

coverage for $15.56. The difference is the cost of the broker's compensation, and it comes directly from participants' paychecks.

52. Broker compensation of 10 percent or less—which, as detailed below, comparable employer plans show is achievable—would have resulted in dramatically lower premiums.

53. The broker's control over the commission structure is reinforced by the broker's control over carrier recommendations. Like other large brokers, Aon maintains “carrier panels”—curated lists of insurance carriers with which Aon has pre-existing relationships and compensation agreements. When an employer such as Macy's elects to provide supplemental health insurance coverage, Aon solicits bids from carriers on its panel. Aon controls which carriers are invited to bid, which bids are presented to the employer, and how those bids are framed. Aon's gatekeeping function means that the employer—and by extension, participants—never see the full market of available options. They see only the options Aon has pre-screened.

54. The commission structure also influences the broker's incentives with respect to carrier retention and “churning.” In the supplemental health insurance industry, “heaped” commissions—where the broker receives a high first-year commission (often 60 to 75 percent of premiums) followed by lower renewal commissions—create a powerful incentive for brokers to switch carriers every few years to capture another large first-year payout. This practice, known as “churning,” disrupts program continuity for participants and generates windfall profits for brokers at participants' expense. The Plan's filings display this exact pattern twice

over: elevated first-year-style rates at the start of the class period (50.8 percent in the 2019 plan year, including 65.1 percent on critical illness) declining toward renewal levels (22.8 percent by 2021), followed by a carrier switch in the 2022 plan year and an immediate resetting of the heap—62.8 percent in the first year on the new Aflac-subsidiary paper, declining to 37.9 percent and then 22.8 percent in the two years after.

55. The 2022 plan year transition is particularly probative of imprudence. In a single, undisclosed transaction, three things changed at once: the carrier (from the Allstate subsidiary to the Aflac subsidiary), the product structure (from three separately rated contracts—accident, critical illness, and hospital indemnity—to a single bundled contract, eliminating product-level rate transparency), and the commission rate (from 22.8 percent to 62.8 percent, nearly triple). Each of these changes was material to participants. None was disclosed to them. A prudent fiduciary running a competitive process does not emerge from it paying its broker nearly three times more for the same products.

56. Plaintiff suffered direct financial harm from Macy's decision to cause the Plan to contract with Aon and the carriers. Plaintiff paid premiums from her wages. The premiums were calculated to cover the exorbitant broker compensation. Lower compensation would have produced a lower premium. Compensation at 10 percent would have produced a premium dramatically lower than what participants paid for the same level of insurance coverage.

57. That the carriers paid the commissions to Aon after receiving premiums paid by Plaintiff changes nothing. Plaintiff paid more than she should have because Aon demanded, and the carriers paid Aon, exorbitant compensation.

58. Aon has served as the Plan's broker for voluntary benefits continuously since at least the 2019 plan year. Aon selected or recommended the carriers for accident, critical illness, and hospital indemnity coverage, designed and structured the supplemental health insurance offerings, and determined the commission structure that the carriers would build into their premium rates.

59. Throughout the Class Period, Aon received commissions and fees from Plan assets based on the Plan's supplemental health insurance premiums. The compensation structure, compensation payments, and relevant premium data are set forth in the following table and drawn from the Plan's Form 5500 Schedule A filings[1]:

| Plan Year (beg. July 1) | Premiums | Broker Commissions and Fees | Compensation as % of Premiums |
|---|---:|---:|---:|
| 2019 | $6.10 M | $3.10 M | 50.8% |
| 2020 | $6.84 M | $1.96 M | 28.6% |
| 2021 | $6.55 M | $1.49 M | 22.8% |

[1]The premium, compensation, covered-lives, and rate figures in this Complaint are drawn from the Plan's and comparator plans' publicly filed Form 5500 Schedule A data as reported to the U.S. Department of Labor, and unless otherwise noted reflect total intermediary compensation (commissions and fees, all reported brokers combined). The Plan operates on a plan year beginning July 1; plan years are identified by the year in which they begin. Carriers occasionally report bundled or consolidated figures on Schedule A; the figures herein reflect the filings as reported, and Plaintiff reserves the right to refine them following discovery.

| | | | |
|---|---|---|---|
| 2022 | $5.30 M | $3.33 M | 62.8% |
| 2023 | $5.17 M | $1.96 M | 37.9% |
| 2024 | $6.15 M | $1.40 M | 22.8% |
| 2019 to 2024 | $36.12 M | $13.24 M | 36.7% |

60. The average compensation rate over the six-plan-year period was 36.7 percent of premiums—meaning that of every dollar employees paid in supplemental health insurance premiums, approximately 37 cents was consumed by broker commissions and fees that were built into the premium rates. In the 2022 plan year, when the carrier switched, the compensation rate spiked from 22.8 percent to 62.8 percent—nearly a three-fold increase—consistent with a heaped commission structure in which the broker extracted the maximum possible first-year payout from participants' premiums on the new placement. Even setting the two spike years aside, the rate never fell below 22.8 percent in any plan year—itself multiples of the zero-to-9-percent rates that Macy's own retail peers, identified below, paid for the identical products.

61. The Plan's Schedule A filings also permit a product-level view. For the 2019 through 2021 plan years, when the products were separately rated, the broker compensation rate on the critical illness contracts was the most extreme—including 65.1 percent in the 2019 plan year—while the bundled contract structure adopted in 2022 eliminated product-level rate visibility entirely:

| Product (per Schedule A) | Premiums | Commissions and Fees | Weighted Rate |
|---|---|---|---|
| Accident (2019-2021, 3 contracts) | $3.33 M | $0.94 M | 28.2% |
| Critical Illness (2019-2021, 3 contracts) | $6.84 M | $2.82 M | 41.2% |
| Hospital Indemnity (2019-2021, 3 contracts) | $9.33 M | $2.80 M | 30.0% |
| Accident, Critical Illness, Hospital Indemnity (bundled, 2022-2024, 3 contracts) | $16.62 M | $6.69 M | 40.3% |

62. The services Aon provided did not justify compensation at these levels. Because supplemental health insurance products are highly commoditized across carriers—with substantially similar coverage structures, benefit triggers, and policy terms—the broker's ongoing services consisted primarily of administrative coordination, not complex advisory work. The compensation vastly exceeded the value of the services. Aon was paid as if it were building the program from scratch every year. It was not.

D. Substantially Similar Supplemental Insurance Products Were Available Throughout the Class Period at Lower Cost

63. Similarly situated welfare plans and their participants pay much lower premiums for the same supplemental health insurance products: accident, critical illness, and hospital indemnity coverage. Unless otherwise noted, every comparator figure below reflects the comparator's total intermediary compensation—commissions and fees combined, across all brokers reported on the contract—as reported on the comparator plan's Form 5500 Schedule A filings. The Plan's own figures in this Complaint are computed on the same all-in basis, so the comparisons are apples to apples.

64. As the comparators set forth below demonstrate, broker compensation around 10 percent or less is attainable for comparable plans for identical product categories. The only material differences between these products and the supplemental health insurance provided to the Plan are the premium charge, the loss ratio, and the brokerage compensation.

65. The Target Corporation Employee Umbrella Welfare Benefit Plan—the plan of one of Macy's most direct national retail competitors—reported Aon Consulting, Inc. as the sole broker on its accident, critical illness, and hospital indemnity policies (each bundled on Schedule A with an indemnity line) through American Heritage Life Insurance Company—the same carrier that issued the Plan's policies in the 2019 through 2021 plan years—in its 2019 Form 5500 filing. Those three contracts covered between approximately 24,300 and 31,400 lives each and carried approximately $10.0 million in combined premiums. Aon collected total reported commissions of $214—effectively zero percent of premiums. In the same plan

year, the same Aon organization collected commissions and fees of 50.8 percent of premiums on the same product categories through the same carrier at Macy's. In its 2024 filing, Target reported a single bundled accident, critical illness, hospital indemnity, and indemnity contract through the same carrier, covering approximately 39,000 lives on $9.9 million in premiums, with its broker collecting fees of approximately 1.9 percent of premiums and zero commissions. To the extent Target compensated its broker directly, outside participants' premium rates, that only sharpens the point: nothing about these products requires broker compensation to be extracted from employee paychecks at all.

66. The HCA Inc. Health and Welfare Benefits Plan reported Marsh & McLennan Agency, LLC as its broker for critical illness and accident protection policies in 2021, and for hospital indemnity, critical illness, and accident protection policies from 2022 through 2024, in each case through UnitedHealthcare Insurance Company. The plan covered between approximately 21,500 and 44,400 lives. Marsh & McLennan collected less than 4.3 percent in commissions and fees in any single year, with an average across the plan's four Form 5500 filings of approximately 3.2 percent.

67. The Home Depot Group Benefits Plan reported Willis Towers Watson US LLC as its sole broker for critical illness policies through American Heritage Life Insurance Company—again, the same carrier that issued the Plan's 2019 through 2021 policies—from 2020 through 2022. The plan covered between approximately 40,300 and 57,300 lives on those contracts, on $35.0 million in premiums. Willis

Towers Watson collected no more than 5.0 percent in commissions and fees in any single year, with an average across the three filings of approximately 4.8 percent. The critical illness rate at the Plan over its corresponding American Heritage years ran 26.3 to 65.1 percent.

68. The Dollar Tree, Inc. Group Health Benefit Plan—another national mass-market retailer—reported its brokers for critical illness, accident, and hospital policies through Metropolitan Life Insurance Company from 2020 through 2022, and through Unum Insurance Company in 2023 and 2024. Alliant Insurance Services, Inc. was the reported broker in 2020 (a year in which the plan reported fees but no commissions), with Lockton Companies, LLC the lead broker from 2021 through 2024. The plan covered between approximately 16,200 and 22,100 lives. The brokers collectively collected no more than 13.9 percent in commissions and fees in any single year, with an average across the plan's five Form 5500 filings of approximately 9.0 percent.

69. The following table summarizes these comparators, on the all-in basis described above:

| Employer | Year(s) | Covered Lives | Broker | Commissions and Fees |
|---|---|---|---|---|
| Target Corporation | 2019; 2024 | ~24,300 to 39,100 | Aon; Pacific Resources | 0.0%; 1.9% |
| HCA Inc. | 2021 to 2024 | ~21,500 to 44,400 | Marsh & McLennan | 3.2% |

| | | | | |
|---|---|---|---|---|
| Home Depot U.S.A. | 2020 to 2022 | ~40,300 to 57,300 | Willis Towers Watson | 4.8% |
| Dollar Tree, Inc. | 2020 to 2024 | ~16,200 to 22,100 | Lockton / Alliant | 9.0% |
| Macy's, Inc. | 2019 to 2024 | ~8,900 to 28,600 | Aon | 36.7% |

70. These comparators spotlight the significant discrepancy between the broker compensation paid by Macy's participants and that paid by employees elsewhere.

71. That gap holds when comparing Macy's to employers and plans of similar size. It holds across brokers. And it holds—most tellingly—at Macy's direct retail peers: Target, Home Depot, and Dollar Tree all maintained all-in broker compensation between zero and 9 percent for the identical product categories, two of them through the very same carrier that served the Plan.

72. Regardless of the point of comparison, the bottom line is that Macy's employees paid more and got less.

73. These comparators are not outliers. Plaintiff has examined the Form 5500 filings of more than 16,000 employers that offer critical illness, accident, and/or hospital indemnity insurance. That aggregate dataset, which includes employers of all sizes and all brokers, shows a median all-in broker compensation rate of approximately 20 percent of premiums. The Plan's six-year average of 36.7 percent

sits well above the 75th percentile of that distribution; its 2019 critical illness rate of 65.1 percent is higher than approximately 98 percent of all critical illness contracts in the dataset; and its 2022 bundled rate of 62.8 percent is higher than approximately 95 percent of all comparable bundled contracts.

74. In addition, according to industry veterans, the historical benchmark for broker commissions in the supplemental health market (accident, critical illness, and hospital indemnity coverage) is 15 percent. And as reflected in the specific comparators above, larger employers like Macy's—who exercise bargaining leverage and economies of scale—can frequently obtain far lower compensation.

75. The compensation rates at the Plan—36.7 percent on average, peaking at 65.1 percent on a single product and 62.8 percent across the whole program—are not merely above average. They are multiples of what comparable plans pay for identical products and identical services. The gap between what Macy's participants paid and what participants at comparably situated plans paid represents the measure of harm inflicted by Defendants' breaches.

### E. Aon's Own Placements Show What Aon Charges for the Same Services

76. Aon's own book of business—as reported on the Form 5500 Schedule A filings of other employer plans where Aon entities appear as broker—demonstrates that Aon knew its compensation at the Plan was far above what it charges other clients for the same services. These placements are Aon's own rate card: the price Aon itself sets for brokering the same product categories.

77. At Target Corporation in 2019, as described above, Aon Consulting, Inc. placed approximately $10.0 million of accident, critical illness, and hospital indemnity premium through American Heritage Life Insurance Company—the Plan's own carrier—for total reported commissions of $214, effectively zero.

78. At Valmont Industries, Inc. in 2023 and 2024, Aon Consulting, Inc. was the reported broker on separate accident, critical illness, and hospital indemnity contracts through Metropolitan Life Insurance Company—the same three-product structure the Plan used from 2019 through 2021—and was compensated on a fee basis amounting to approximately 1.7 to 3.4 percent of premiums on those contracts.

79. At Lam Research Corporation in 2021, Aon entities were the reported brokers on a critical illness contract through Metropolitan Life Insurance Company covering approximately 3,900 lives, and collected fees amounting to approximately 1.2 percent of premiums, with no commissions.

80. At R&L Carriers, Inc. in 2024, Aon entities were the reported brokers on a group accident contract through Unum Insurance Company covering approximately 7,300 lives, and collected fees amounting to approximately 5.2 percent of premiums, with no commissions.

81. Several of these placements are smaller than the Plan. That makes the comparison more probative, not less: in the brokerage industry, commission rates generally fall as account size grows, because the broker's work scales far more slowly than the premium volume. Aon charged some of its smaller accounts low single digits—and even at mid-sized placements on Aon's book of the same product

categories, such as Michelin North America (approximately 6,700 to 10,100 lives), Aon's reported compensation ran approximately 16 to 20 percent of premiums—elevated, but still a fraction of the 50.8 percent and 62.8 percent extracted from the Plan in 2019 and 2022. Aon's largest voluntary-benefits client in this product set paid its highest rates.

### F. The 2022 Carrier Switch Was a Closed Aon-Aflac Channel, Not a Market Test

82. The 2022 plan year transition to Continental American was not the product of competitive market testing. It bears the fingerprint of a closed placement channel between Aon Insurance Agency LLC and the Aflac subsidiary.

83. At BlueTriton Brands, Inc., Aon Insurance Agency LLC—the same Aon entity that placed the Plan's 2022 through 2024 contracts—placed the same bundled accident, critical illness, and hospital indemnity product through the same carrier, Continental American, beginning in the same 2022 plan year. The BlueTriton placement displays a near-identical heaped rate trajectory: 65.1 percent in 2022, 37.9 percent in 2023, and 21.8 percent in 2024 (covering approximately 900 to 3,500 lives). The Plan's trajectory over the same three years was 62.8 percent, 37.9 percent, and 22.8 percent.

84. Two unrelated employers do not arrive independently at the same first-year commission spike, the same second-year step-down, and the same third-year renewal rate, through the same broker entity and the same carrier, in the same years. The pattern indicates a standardized, heaped compensation schedule embedded in Aon Insurance Agency's Continental American placements—a channel in which the

broker's compensation structure was set by the channel, not negotiated by the fiduciary, and in which no competitive bidding disciplined the rates. A fiduciary that had market-tested the 2022 placement would have discovered the heap before agreeing to it.

### G. Macy's Failed to Prudently Evaluate and Monitor Supplemental Health Insurance Costs

85. Had Macy's conducted a diligent and competitive bidding process for its supplemental health insurance program, it would have learned that it could obtain such coverage on behalf of the Plan and its participants at much lower cost for the same levels of coverage. That, over six plan years, Macy's allowed the Plan and participants to pay exorbitant premiums to cover exorbitant broker compensation suggests Macy's failed to act prudently and diligently in monitoring costs, including failing to conduct a competitive bidding process for the supplemental health insurance. The Plan's Form 5500 filings show no change in broker over the entire six-year period—through two carriers, a product restructuring, and a near-tripling of the commission rate—and no publicly available records reflect any solicitation of alternative brokers.

86. Publicly available market data—including Form 5500 filings from comparable employer plans—shows the premiums and compensation are unreasonable. Comparable large employer plans, including Macy's direct retail competitors, routinely maintained all-in broker compensation of 10 percent or below for substantially similar supplemental health insurance products during the same period. Yet Macy's participants paid 36.7 percent average compensation. No prudent

fiduciary could have failed to discover this disparity through even minimal benchmarking, and no prudent fiduciary could observe it and take no action.

### H. Macy's Misrepresented the Rates to Its Employees, and the Misrepresentation Is Ongoing

87. ERISA's duty of loyalty forbids a fiduciary from materially misleading plan participants. Macy's did not merely fail to disclose the commission load embedded in participants' premiums—it affirmatively characterized the rates as favorable.

88. Macy's "Benefits at a Glance" enrollment guide for the 2025-2026 plan year, issued to its Seasonal, Flex, Contingent, Temporary, Short Hour, and Evening/Weekend colleagues, states: "To help defray costs, we offer Critical Illness, Accident, and Hospital Indemnity options at discounted group rates." Macy's separate "Benefits at a Glance" guide for the same plan year, issued to its Bluemercury hourly colleagues, repeats the identical sentence verbatim. Neither document discloses the carrier, the broker, or the commission load. The verbatim repetition of the "discounted group rates" language across guides issued to distinct workforce subsets shows that the characterization is institutional boilerplate, not a drafting accident—and the audiences receiving it are the hourly, seasonal, and part-time retail workers least equipped to investigate the commission economics behind their premium rates.

89. The representation is false. Rates inflated by broker compensation running 36.7 percent of premiums on average—multiples of the roughly 20 percent market median and of the zero-to-9-percent rates at Macy's own retail peers—are not "discounted" in any sense a reasonable participant would understand. A reasonable

participant reading “discounted group rates” would conclude that Macy's had used its scale to obtain favorable pricing. The opposite was true: the Plan's scale was used to generate outsized broker compensation.

90. Macy's own Summary Annual Report for the Plan for the plan year ending June 30, 2023—the worst compensation year in the Plan's filings, at 62.8 percent—identified Continental American as a carrier and reported total premiums, and informed participants of their right to request “insurance information, including sales commissions paid by insurance carriers.” But Macy's never disclosed the commission rate, the broker's identity in connection with the supplemental products, or the fact that the rate had nearly tripled in connection with the 2022 carrier switch. A “you may inquire” notice does not discharge a fiduciary's affirmative duty not to mislead, particularly while the fiduciary is simultaneously telling the same participants the rates are “discounted.”

91. Because the “discounted group rates” representation appears in enrollment materials Macy's is distributing in the current plan year, the breach is ongoing, and prospective equitable relief under ERISA § 502(a)(3) is necessary to protect current and future participants.

## CLASS ACTION ALLEGATIONS

92. Plaintiff seeks certification of a class consisting of all participants in and beneficiaries of the Macy's, Inc. Enhanced Benefits Program who paid premiums for supplemental health insurance issued by American Heritage Life Insurance Company or Continental American Insurance Company (including accident, critical

illness, or hospital indemnity coverage) at any time during the period from the date of the filing of the Complaint going back six years (the "Class" and "Class Period").

93. The Class is so numerous that joinder of all members is impracticable. The Plan covers approximately 56,000 participants, and the supplemental health insurance contracts covered between approximately 8,900 and 28,600 lives in each year of the Class Period. The Class likely numbers in the tens of thousands.

94. Plaintiff is a member of the Class and has been injured as a result of Defendants' ERISA violations.

95. There are questions of law and fact common to the Class that predominate over questions affecting individual members. Common questions include:

- whether Macy's was a Plan fiduciary;
- whether the Aon Defendants were parties in interest;
- whether the Aon Defendants received Plan assets, directly or indirectly;
- whether Macy's breached its fiduciary duties;
- whether Macy's caused prohibited transactions;
- whether Macy's misrepresentations to participants breached its duty of loyalty;
- whether the compensation received by the Aon Defendants was unreasonable and excessive;
- the appropriate measure of losses; and
- the amount of excess compensation received by the Aon Defendants.

96. Plaintiff's claims are typical of the Class. Plaintiff participated in the Plan, paid premiums for supplemental health insurance, and suffered harm as a result of the excessive compensation structure, just as all Class members did.

97. Plaintiff will fairly and adequately represent the interests of the Class. Plaintiff has no conflicts of interest with other Class members. Plaintiff intends to prosecute this action vigorously and has retained experienced ERISA counsel.

98. A class action is the superior method for fair and efficient adjudication of the claims. The claims involve uniform legal standards and common proof applicable to tens of thousands of participants.

## CLAIMS FOR RELIEF

## COUNT I: BREACH OF FIDUCIARY DUTY

## (29 U.S.C. § 1104(a) — Against Macy's)

99. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

100. Macy's is a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Macy's was the Plan administrator during the Class Period to the present.

101. As detailed above, Macy's breaches its fiduciary obligations of prudence and loyalty with respect the Plan. Macy's failed to act prudently and loyally in that it: (a) failed to conduct any competitive bidding, benchmarking, or market testing of Aon's compensation; (b) failed to evaluate whether the compensation was reasonable given the services provided; (c) failed to compare the compensation to readily

available market benchmarks from comparable employer plans—including the plans of its own direct retail competitors; (d) failed to monitor whether the compensation remained reasonable through the 2022 carrier switch, in which the rate nearly tripled; (e) failed to avoid conflicts of interest with Aon, a provider of corporate services to Macy's; and (f) affirmatively misrepresented the rates to participants as "discounted."

102. As a result of these breaches, the Plan and its participants suffered losses of approximately $9.6 million—the difference between the approximately $13.2 million in total commissions and fees Aon extracted from participant premiums and the approximately $3.6 million that would have been paid at a compensation rate of 10 percent, consistent with market benchmarks for identical products.

103. As the Plan's sponsor and named fiduciary, Macy's had a duty to monitor the performance and compensation of service providers.

104. Macy's failed to perform the monitoring activities that a prudent fiduciary would have undertaken. Over the six-plan-year Class Period, Macy's never reviewed Aon's compensation for reasonableness, never compared it to market benchmarks, never solicited competing bids, never evaluated the relationship between the broker's services and its compensation, and never assessed whether participants were receiving adequate value for their premium dollars.

105. Macy's failure to monitor persisted through identifiable triggering events that should have prompted review. In the 2019 plan year, when the critical illness contract carried a 65.1 percent commission rate, Macy's took no action. In the

2022 plan year, when the carrier, the product structure, and the commission rate all changed simultaneously and the rate spiked from 22.8 percent to 62.8 percent, Macy's took no action. Each year, as Form 5500 filings disclosed the elevated compensation, Macy's took no action. Each of these was a discrete failure to act—a separate breach of the continuing duty to monitor recognized in *Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015).

106. As a result of Macy's failure to monitor, the excessive compensation arrangement continued unabated for six plan years, and approximately $9.6 million in excessive compensation was extracted from participants' premiums. Had Macy's conducted even minimal benchmarking at any point during those years, the publicly available Form 5500 data would have revealed that Aon itself accepted compensation of 5 percent or less at other plans—including effectively zero at Target, on the same products through the same carrier—for the same services. Macy's is liable under ERISA § 409(a), 29 U.S.C. § 1109(a), for all losses resulting from its breaches.

**COUNT II: PROHIBITED TRANSACTION**

**(29 U.S.C. § 1106(a) — Against Macy's)**

107. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

108. Each Aon Defendant is a party in interest to the Plan within the meaning of ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(B). The Aon Defendants provided brokerage services to the Plan, as detailed above.

109. Macy's caused the Plan to engage in prohibited transactions in violation of ERISA § 406(a)(1)(C) and (D), 29 U.S.C. § 1106(a)(1)(C) and (D), by causing Plan assets (participant premiums) to be paid to the Aon Defendants as parties in interest under an unreasonable compensation arrangement, and by causing Plan assets to be transferred to the Aon Defendants in the form of commissions and fees for their benefit embedded in premium rates.

110. The brokerage compensation paid to the Aon Defendants was not reasonable compensation, as demonstrated by the comparator data, Aon's own rate card at other employer plans, the loss-ratio analysis, and the absence of any market-testing by Macy's.

111. Each compensation payment to the Aon Defendants from participant-paid premiums during the Class Period is a distinct prohibited transaction. The aggregate excessive compensation from these payments is approximately $9.6 million more than the 10 percent market benchmark.

## COUNT III: KNOWING PARTICIPATION IN ERISA VIOLATIONS

### (29 U.S.C. § 1132(a)(3) — Against the Aon Defendants)

112. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

113. Under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), a court may award equitable relief against any person, including a non-fiduciary, who knowingly participates in a fiduciary's breach of duty and prohibited transactions.

114. The Aon Defendants knowingly participated in Macy's violations. Aon knew the compensation it received in connection with the Plan's supplemental health insurance program. Aon knew it received far lower compensation in connection with similar supplemental health insurance programs provided by other plan sponsors. Aon's own Form 5500 appearances at other employer plans demonstrate that Aon knew compensation of 5 percent or below was available for substantially the same supplemental health insurance products—indeed, Aon itself placed the same products through the same carrier at Target Corporation, one of Macy's most direct competitors, for effectively zero commissions in the same plan year it collected 50.8 percent at the Plan. Aon therefore knew that its compensation rates at the Plan—peaking at 65.1 percent on a single product and 62.8 percent across the program, and averaging 36.7 percent—were far above market rate. As a sophisticated broker operating across hundreds of employer plans nationally, Aon knew that the compensation it demanded was built into the premium rates participants paid, because that is the standard industry pricing mechanism it participated in daily.

115. The Aon Defendants knew Macy's was the Plan sponsor and Plan administrator and therefore knew Macy's was a Plan fiduciary. Aon knew Macy's caused the Plan to contract with American Heritage and Continental American. Aon knew Plan assets in the form of premiums were paid to the carriers. Aon knew it would receive commissions and fees from the premium payments. Aon knew the amount of the premium payments included payment for its compensation. Aon knew it was providing services to Macy's and the Plan as a broker of insurance products.

116. The Aon Defendants are liable for equitable relief under ERISA § 502(a)(3), including restitution, disgorgement, and the imposition of a constructive trust.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of the Plan and the Class, respectfully requests that this Court:

A. Find and declare that Macy's breached its fiduciary duties under ERISA § 404(a), 29 U.S.C. § 1104(a), that Macy's caused prohibited transactions under ERISA § 406, 29 U.S.C. § 1106, and that the Aon Defendants are parties in interest to the Plan who knowingly participated in Macy's breaches of duties and prohibited transactions;

B. Find Macy's liable under ERISA § 409(a), 29 U.S.C. § 1109(a), to make good on all losses to the Plan resulting from its violations, and to restore the Plan to the position it would have occupied but for the breaches of fiduciary duty and prohibited transactions;

C. Find the Aon Defendants liable under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), for knowing participation in Macy's ERISA violations;

D. Order disgorgement of all assets, profits, commissions, and fees obtained by the Aon Defendants;

E. Order the reversal of all non-exempt prohibited transactions;

F. Determine the appropriate method for calculating the Plan's losses under ERISA § 409(a);

G. Order Defendants to provide a full and complete accounting of all commissions, fees, and other compensation received from or in connection with the Plan;

H. Remove breaching fiduciaries and enjoin Defendants from any future violations of ERISA's fiduciary and prohibited-transaction provisions;

I. Surcharge Defendants, requiring restoration to the Plan of all improper, excessive, and unlawful amounts paid as broker commissions and fees;

J. Require that Macy's implement a competitive bidding process for broker services for the Plan's supplemental health insurance program going forward, with bids reviewed every three to five years;

K. Enjoin Macy's to correct its participant-facing enrollment materials, including the representation that the Plan's supplemental health insurance products are offered "at discounted group rates," and to disclose to participants the broker compensation embedded in their premium rates;

L. Appoint an independent fiduciary to oversee the Plan's supplemental health insurance program during a transition period to ensure that future arrangements comply with ERISA's fiduciary standards;

M. Impose a constructive trust over all commissions, fees, and profits received by the Aon Defendants;

N. Certify the Class as requested herein and appoint Plaintiff as class representative and her counsel as Class Counsel;

O. Award attorneys' fees and costs under ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1), and the common fund doctrine;

P. Award pre-judgment and post-judgment interest to the extent permitted by law; and

Q. Grant such other and further equitable or remedial relief as this Court deems just and appropriate.

DATED this 3rd day of October, 2026.

BAILEY & GLASSER LLP

By *<u>/s/ Mark G. Boyko</u>*
Gregory Y. Porter (NY Bar No. 1002490)
Ryan T. Jenny (NY Bar No. 3008745)
Mark G. Boyko (NY Bar No. 4306122)
Laura Babiak (*to be admitted Pro Hac Vice*)
80 Pine Street
33rd Floor
New York, NY 10005
Telephone: (202) 463-2101
Facsimile: (202) 463-2103
gporter@baileyglasser.com
rjenny@baileyglasser.com
mboyko@baileyglasser.com
lbabiak@baileyglasser.com

*Attorneys for Plaintiff and the Proposed Class*